02-10-278-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00278-CV 

 

 


 
 
 Scott R. Leake and Susan E. Leake, Individually and
 on Behalf of the Architectural Control Committee of the Sunny Meadows
 Addition
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Therman M. Campbell, Jr. and Susan M. Campbell
 
 
  
 
 
 APPELLEES 
 
 


 

 

----------

 

FROM THE 342nd
District Court OF Tarrant COUNTY

----------

 

OPINION

----------

          Appellants
Scott R. and Susan E. Leake, individually and on behalf of the Architectural
Control Committee of Sunny Meadows Addition, appeal from the trial court’s
summary judgment in favor of appellees Therman M. and Susan M. Campbell.  In
two issues, the Leakes claim that the trial court reversibly erred by denying
their motion for summary judgment while granting the Campbells’ and by awarding
attorney’s fees to the Campbells.  We reverse and remand.

Background
Facts

          The
Campbells purchased their home at 3102 Sunny Meadows Court, Dalworthington
Gardens, Tarrant County, Texas, on December 27, 2007.  The Leakes are the
Campbells’ neighbors and have lived at 3104 Sunny Meadows Court since July 31,
1990.  The housing community in which they all reside, Sunny Meadows Addition,
is subject to recorded deed restrictions.  The part of the restrictive
covenants that are pertinent to this case are the following:

For the purpose of
creating and carrying out a uniform plan for the improvements and sale of the
lots, blocks and homesite tracts to be made from the land described herein, the
following restrictions upon the use of said property are hereby established and
shall be referred to, adopted and made a part of each and every contract and
deed executed. . . . 

 

          . . . .

 

(3)  No structure
shall be erected, altered, placed or permitted to remain on any lot carved from
the above described property other than one single family dwelling not to
exceed (except by Architectural Control Committee approval) two stories in
height, private attached or detached garage or carport for not more than four
(4) cars facing a direction other than the street, and reasonable outbuildings
for single family use. . . .

 

(4)  No house,
dwelling and/or other structure of any kind or character whatsoever may be
moved into any lot carved out of the property described herein.

 

          . . . .

 

Architectural Control:
 No building shall be erected, placed or altered on any lot until the
construction plans, specifications, and a plan showing the location of the
structure shall have been approved by the Architectural Control Committee. . . . 
Approval shall be as provided in Paragraph 3 below.

 

Procedure:  Committee’s
approval for [sic] disapproval as required by this covenant shall be in
writing.  In the event the committee or it’s [sic] designated representative
fails to approve or disapprove within 15 days after plans, specifications and
plot plan have been submitted to it or in any event if no suit to enjoin
the construction has been commenced prior to the completion thereof, approval
will not be required and the restrictive covenants herein contained shall be
deemed to have been fully complied with.

 

(4)  These
restrictions are for the benefit of and shall inure to each and every property
owner in this addition, and may be enforced by anyone [sic] or more of such
property owners and they shall be allowed to recover from a violating party,
all costs and attorney fees and out-of-pocket expenses incurred in enforcement
of any covenants herein whether by judicial means or settlement.  [Emphasis
added.]

 

The
Campbells claim that they were unaware of the deed restrictions when they purchased
their property while the Leakes claim that they specifically chose the
community because of its deed restrictions.

          After
the Campbells purchased their home, they sought to make improvements to the
property.  On January 8, 2008, Tuff Shed constructed a storage shed on the
Campbells’ property.  According to Therman Campbell, Tuff Shed employees constructed
the shed on-site.[1]
 In addition to the shed, Therman wished to build a carport and shelter for his
motor home.  As a first step, he began to pour a concrete pad and driveway on
January 21, 2008; he completed the work on January 26, 2008.  Next, Therman
purchased a spa, along with a cabana to cover and enclose the spa, on February
4, 2008.  The installation of the spa and construction of the cabana both
occurred on February 11, 2008.  Lastly, Therman sought to have an RV shelter
installed.  Before doing so, Therman approached Scott Leake in April 2008 seeking
approval for his plans.  Scott conveyed his disapproval with the plans and
directed Therman’s attention to the restrictive covenants barring this type of
construction.  According to Scott, immediately after this conversation, he
informed ACC member Mark Appling of Therman’s plan to construct an RV shelter. 
According to Appling, he went to the Campbells’ home that same day and informed
Therman of the restrictive covenants and the likelihood that the RV shelter
would be in violation of those restrictive covenants.  Within a week Appling
hand delivered a copy of the restrictive covenants to Therman.  Therman
nevertheless had the RV shelter constructed on May 5, 2008.

          On
May 10, 2008, Appling went to the Campbells’ home and informed them that the
shed, cabana, and RV shelter were not in compliance with the restrictive
covenants.  On the following day, Therman wrote to the ACC requesting a
variance for the three structures.  On or about May 20, 2008, Therman received
a letter from Kerry Moseley, a member of the ACC and one of the developers of
the subdivision, informing Therman that his request for a variance was denied
and instructing the Campbells to remove the shed, cabana, and RV shelter at
once.  The letter went on to specify the reasons for denying the Campbells’
variance, which included not seeking the ACC’s approval before installation and
construction of the three structures.  Campbell responded with another letter,
imploring the ACC to reconsider its findings.  The ACC remained unpersuaded,
and the structures remained on the Campbells’ property.

          The
Leakes sued the Campbells on November 13, 2008, seeking a declaratory judgment
that the structures are in violation of the restrictive covenants, a permanent
injunction ordering the Campbells to remove the structures, and attorney’s
fees.  The Campbells filed their first amended original answer and counterclaim
on November 30, 2009, in which they raised the affirmative defenses of waiver,
estoppel, and violation of section 202.004(a) of the property code and also pled
for attorney’s fees under the Uniform Declaratory Judgments Act.  Tex. Civ.
Prac. & Rem. Code Ann. § 37.009 (West 2008); Tex. Prop. Code Ann. §
202.004(a) (West 2007) (“An exercise of discretionary authority by a property
owners’ association or other representative designated by an owner of real
property concerning a restrictive covenant is presumed reasonable unless the
court determines by a preponderance of the evidence that the exercise of
discretionary authority was arbitrary, capricious, or discriminatory.”).  The
Campbells then filed a traditional summary judgment motion claiming that the
structures were deemed approved under the deed restrictions because the lawsuit
had not been filed until after the completion of construction.  The Leakes
filed a response and their own traditional and no-evidence motions for summary
judgment, claiming that the structures violate the restrictive covenants as a
matter of law and that the Campbells had not brought forward any evidence of a waiver
of a right to enforce the restrictive covenants or a violation of property code
section 202.004(a).  At the conclusion of a hearing on both motions, the trial
court granted the Campbells’ motion for summary judgment, denied the Leakes’
motion, and awarded the Campbells attorney’s fees in the amount of $10,348 and
costs of $305.32.

Standard
of Review

We
review a summary judgment de novo.  Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light
most favorable to the nonmovant, crediting evidence favorable to the nonmovant
if reasonable jurors could, and disregarding evidence contrary to the nonmovant
unless reasonable jurors could not.  Mann Frankfort Stein & Lipp
Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge
every reasonable inference and resolve any doubts in the nonmovant’s favor.  20801,
Inc. v. Parker, 249 S.W.3d 392, 399 (Tex. 2008).  A defendant who
conclusively negates at least one essential element of a cause of action is
entitled to summary judgment on that claim.  Frost Nat’l Bank v. Fernandez,
315 S.W.3d 494, 508 (Tex. 2010), cert. denied, 131 S. Ct. 1017 (2011); see
Tex. R. Civ. P. 166a(b), (c).

When
both parties move for summary judgment and the trial court grants one motion
and denies the other, the reviewing court should review both parties’ summary
judgment evidence and determine all questions presented.  Mann Frankfort,
289 S.W.3d at 848; see Myrad Props., Inc. v. Lasalle Bank Nat’l Ass’n,
300 S.W.3d 746, 753 (Tex. 2009).  The reviewing court should render the
judgment that the trial court should have rendered.  Mann Frankfort, 289
S.W.3d at 848.

Propriety
of Summary Judgment for the Campbells

          In
their first issue, the Leakes claim that the trial court erred in granting
summary judgment to the Campbells and denying their motion for summary judgment
because the court based its decision on an erroneous construction of the
restrictive covenants.

Interpretation
of Restrictive Covenants

          We
review a trial court’s interpretation of a restrictive covenant de novo.  Raman
Chandler Props, L.C. v. Caldwell’s Creek Homeowners Ass’n, 178 S.W.3d 384,
390–91 (Tex. App.––Fort Worth 2005, pet. denied); Air Park–Dallas Zoning
Comm. v. Crow Billingsley Airpark, Ltd., 109 S.W.3d 900, 909 (Tex. App.––Dallas
2003, no pet.).  We construe restrictive covenants in accordance with general
rules of contract construction.  Pilarcik v. Emmons, 966 S.W.2d 474, 478
(Tex. 1998); Raman Chandler, 178 S.W.3d at 391.  Whether restrictive
covenants are ambiguous is a question of law.  Raman Chandler, 178
S.W.3d at 391; Dyegard Land P’ship v. Hoover, 39 S.W.3d 300, 308–09
(Tex. App.––Fort Worth 2001, no pet.).  A covenant is unambiguous as a matter
of law if it can be given a definite or certain legal meaning.  Pilarcik,
966 S.W.2d at 478; Raman Chandler, 178 S.W.3d at 391.  Mere disagreement
over the interpretation of a restrictive covenant does not render it ambiguous.
 Air Park–Dallas, 109 S.W.3d at 909.  An unambiguous restrictive
covenant should be liberally construed to give effect to its purpose and
intent.  Tex. Prop. Code Ann. § 202.003(a) (West 2007); Dyegard Land P’ship,
39 S.W.3d at 308–09.

Analysis

          Here,
both motions for summary judgment hinge on the proper interpretation of the “in
any event” deemed approval provision found under the right to enforce section
of the restrictive covenants:

In the event the committee
or its [sic] designated representative fails to approve or disapprove within 15
days after plans, specifications and plot plan have been submitted to it or
in any event if no suit to enjoin the construction has been commenced prior
to the completion thereof, approval will not be required and the restrictive
covenants herein contained shall be deemed to have been fully complied with. 
[Emphasis added.]

 

While
each party agrees that the language is unambiguous, each interprets it
differently.  The Leakes contend that the deemed approval language is effective
only after plans and specifications have been submitted to the ACC in writing
by a homeowner.  Thus, under the Leakes’ interpretation, the “in any event” language
does not apply to situations in which the homeowner fails to seek approval
before beginning and completing construction.  On the other hand, the Campbells
claim that in conformance with this court’s opinion in Buckner v. Lakes of
Somerset Homeowners Ass’n, 133 S.W.3d 294 (Tex. App.––Fort Worth 2004, pet.
denied), the phrase allows for deemed approval of violations in any situation
other than those in which the ACC has given its approval or has failed to
disapprove of plans, e.g., when the ACC disapproves but fails to enjoin
construction of violating structures before their completion.  According to the
Campbells, it does not matter whether plans are submitted before construction
because a plain reading of “in any event” suggests an acceptance of all
scenarios.  The Leakes claim Buckner should not control here.

          As
both parties make clear in their respective briefs, our decision turns on our
prior opinion in Buckner.  In Buckner, a homeowner sought
approval of a roofing material from the subdivision’s ACC but began installing
the roof without waiting for the ACC’s decision.  Id. at 295.  The ACC
eventually disapproved the roofing materials, but the homeowner continued to
complete the roof with the disapproved materials.  Id.  Although
communications between the homeowner and ACC took place over the course of at
least a month, the homeowners’ association did not file suit until after the
homeowner had completed the roof.  Id. at 295–96, 298.  The “deemed
approval” language in that case stated as follows:

[N]or shall any
exterior addition to or change or alteration therein be made until the details
. . . shall have been submitted to and approved in writing . . . by [the ACC]. .
. .  In the event the [ACC] fails to approve or disapprove any such detail,
design, plan, specification or location within thirty (30) days after
submission to it, or in any event if no suit to enjoin has
been commenced prior to the completion thereof, approval will not be required
and this Article will be deemed to have been fully complied with.

 

Id. at
296–97.

We
held that the above language

is unambiguous. 
After describing one manner in which approval will be deemed, in the
event the ACC fails to approve or disapprove submitted plans within 30 days after
submission, the article continues by describing another manner of deemed
approval:  LSHOA’s failure to file suit before the roof is complete.  The use
of the word “any” shows an intent to describe all scenarios other than those in
which the ACC gives its explicit approval or fails to disapprove submitted
plans within 30 days:  when the homeowner has not complied with Article VI
by requesting preapproval or when the ACC has denied approval and the
homeowner continues making alterations in accordance with the disapproved
plans.  LSHOA’s proposed interpretation would render the “in any event”
language meaningless; if the ACC does not approve or disapprove of the
submitted plans within 30 days, the plans are deemed approved in accordance
with Article VI.  Thus, a subsequent suit to enjoin activities completed in
accordance with such plans would be pointless because LSHOA would lose.

 

LSHOA contends that Pilarcik
v. Emmons controls this issue because the supreme court construed the same
language in that case and determined that “the covenants [in that case] dictate
default consequences in the event the ACC does not act swiftly enough.” 966
S.W.2d at 480.  The covenant in Pilarcik is almost identical to the
covenant in this case.  LSHOA contends that the quoted language indicates that “default
consequences” should occur only if the ACC does not approve or
disapprove of a homeowner’s plans timely enough.  However, in Pilarcik a
group of individual homeowners, rather than the homeowners association, sued
the nonconforming homeowner, and the issue was whether the ACC could grant
approval of nonconforming materials after the 30 day period had
expired.  Id. at 476, 479–80.  The homeowners filed suit when the roof
was 98 percent complete; thus, the second part of the covenant, which is at
issue in this case, was not at issue in that case.  Id. at 477. 
Further, the quoted language from Pilarcik supports our conclusion:  by
not filing suit before the Buckners completed construction of their new roof,
i.e., by not acting swiftly enough, LSHOA may suffer default consequences,
i.e., the nonconforming roofing materials being deemed approved.

 

Id. at
297–98 (underlining added).

We
agree that if we were bound to follow the underlined language above in Buckner,
we would affirm the summary judgment for the Campbells.  However, a more
careful reading of the restrictive covenants in Buckner and in this case
compels us to conclude that the underlined language above was not necessary to
the disposition in Buckner and was, therefore, dictum.  In addition,
that underlined language conflicts with another provision of the restrictive
covenants in this case and in Buckner.  In the present case, the provision
reads,

[T]he owner or owners
of any of the above land shall have the right to sue for and obtain an
injunction, prohibitive or mandatory, to prevent the breach of or to enforce
the observance of the restrictions, in addition to ordinary legal actions for
damages, and failure to of the parties or owner or owners of any of the lot
or lots . . . to enforce any of the restrictions herein set
forth at the time of its violation shall in no event, be deemed to be a waiver
of a right to do so thereafter.

 

[Emphasis
added.]  The covenants in Buckner contained substantially similar
language.  See Moore v. Zeller, 153 S.W.3d 262, 264 (Tex. App.––Beaumont
2004, pet. denied) (holding that appellate court may judicially notice its own
records); Stroud v. VBFSB Holding Corp., 917 S.W.2d 75, 78 (Tex. App.––San
Antonio 1996, writ denied) (holding same).

In
the present case, the no-waiver language is found in the first section of the
Right to Enforce section of the restrictions.  The language about deemed
approval is found two sections later in the Architectural Control Committee
section that discusses the procedure for approval or disapproval of plans that
are actually presubmitted to the ACC for review.  To construe these seemingly
conflicting provisions in a way that does not render the covenants meaningless
compels only one conclusion:  the “in any event” deemed approval language
applies only when a homeowner actually submits plans to the ACC for matters
which require preapproval by the ACC and the ACC fails to act within the
specified time period.  See Pavecon, Inc. v. R-Com, Inc., 159 S.W.3d
219, 222 (Tex. App.––Fort Worth 2005, no pet.) (“We are to interpret a contract
in such a manner that none of its provisions will be rendered meaningless.”); see
also MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652
(Tex. 1999).[2]  In other words, the
no-waiver language applies generally, and the “in any event” language is a
carveout that applies only if the ACC has been put on notice that a homeowner is
seeking to make alterations that require approval under the applicable
restrictions.  This is not to say that the analysis or result in Buckner was
incorrect, but only that the statement that the “in any event” deemed approval
language applies even “when the homeowner has not complied with Article VI by
requesting preapproval” was unnecessary and not applicable to the facts before
the court in that case.  Therefore, we now limit the holding in Buckner
to apply only to scenarios in which a property owner subject to restrictions
that contain substantially similar “in any event” language seeks preapproval from
the ACC as required by the restrictions and nevertheless completes the
construction without the ACC’s approval before the ACC files a suit to enjoin
the construction.[3]

Here,
unlike in Buckner, the Campbells never sought the ACC’s approval before
commencing construction of the shed, cabana, and RV shelter.  Only after
construction was completed, and after the ACC sent a letter demanding removal
of the three structures, did the Campbells seek a variance.  Thus, the “in any
event” language was never triggered in this case, and the ACC was not required
to file suit to enjoin the Campbells’ construction before that construction was
completed.

Accordingly,
we conclude and hold that the trial court erred by granting the Campbells’
summary judgment.  We sustain the Leakes’ first issue in part.

Propriety of Denial of Leakes’ Motion for
Summary Judgment

The Leakes also contend in their first issue
that the trial court erred by denying their traditional and no-evidence motions
for summary judgment.

In
their traditional motion for summary judgment, the Leakes claim that they
conclusively proved that the RV shelter, cabana, and shed violate the
restrictive covenants.  Specifically, they argue that the RV shelter is a
private carport facing the street in violation of article 1, section 3 of the
restrictions, that the cabana covering the spa and the Tuff Shed are not
“reasonable outbuildings for single family use” as allowed by article 1,
section 3, and that the cabana and shed were preassembled off-site and moved
onto the property in violation of article 1, section 4 of the restrictions.  In
addition, they also claim that the Tuff Shed violates article 1, section 9’s prohibition
against roofs having asphalt composition shingles.[4]

The
Leakes contend that the shed, cabana, and RV shelter violate article 1, section
3 of the covenants, which provide as follows:

No structure shall be
erected, altered, placed or permitted to remain on any lot carved from the
above described property other than one single family dwelling not to exceed (except
by Architectural Control Committee approval) two stories in height, private attached
or detached garage or carport for not more than four (4) cars facing a
direction other than the street, and reasonable outbuildings for single family
use.

 

According
to the Leakes, the shed and cabana are not “reasonable outbuildings,” and the
RV shelter is an impermissible carport or garage facing the street.  The Leakes
did attach a photograph to their motion for summary judgment, which appears to
be of the side of the RV shelter and which appears to show that it is partially
enclosed about halfway down the sides and that at least part of the structure is
open to the street; the shelter, however, according to the Leakes’ own summary
judgment evidence is on the back quarter of the Campbells’ property, is
separated from the street by a private driveway and is further separated from
the driveway by an open metal fence.

          The
Leakes did not present any evidence that a storage shed or cabana would not be
a “reasonable outbuilding[] for single family use.”  Black’s Law Dictionary
defines an outbuilding as “[a] detached building (such as a shed or garage)
within the grounds of a main building.”  Black’s Law Dictionary 1211 (9th ed.
2009).  The Leakes attached to their motion a drawing showing that the shed and
cabana are located directly behind the residence such that it is unlikely that they
are visible from the majority of the street frontage.  But they did not provide
any photographs of the shed or cabana, and, thus, no evidence that their size
is inherently unreasonable; neither did they bring forward any evidence that
those buildings would be used for any purpose other than “single family use.”  Furthermore,
they have not provided any evidence that use of a cabana to cover a spa or a
shed for storing personal belongings is a per se unreasonable use for a
residence.

          As
to the RV shelter, the restrictive covenants provide that any detached garage
or carport must not face the street.  Article 1, section 17 of the restrictive
covenants provides that a “motor home or any recreational
vehicle . . . . must be stored or parked in a fenced or
enclosed area in the back 1/4 of the property or the garage as space will
allow.”  Thus, the restrictions allow a homeowner to place a “fenced or
enclosed area” separate from a garage on the back one-fourth of the homeowner’s
property for the purposes of parking a recreational vehicle.  Article 1,
section 17 does not contain the same prohibition on facing the street as to the
“fenced or enclosed area” used for parking an RV as it does for a detached
garage or carport.  Thus, although the Leakes do not specifically state their
argument this way, they must be contending that because the shelter more
resembles a carport than a “fenced or enclosed area,” it is subject to the
restriction that it not face the street.

          The
restrictive covenants do not define “enclosed area.”  Black’s Law Dictionary
defines an “enclosure” as “[l]and surrounded by some visible obstruction” or “[a]n
artificial fence around one’s estate.”  Black’s Law Dictionary 607 (9th ed.
2009).  It defines “enclose” as “[t]o surround or encompass; to fence or hem in
on all sides.”  Id.  Webster’s Dictionary defines “enclosure” as “the
act or action of enclosing: the quality or state of being enclosed; something
that encloses; something enclosed.”  City of Alamo Heights v. Boyar, 158
S.W.3d 545, 551 (Tex. App.––San Antonio 2005, no pet.) (quoting Webster’s Ninth
New Collegiate Dictionary 409 (9th ed. 1991)).  It further defines “enclose” as
“to close in: surround; to fence off (common land) for individual use; to hold
in: confine.”  Id.

          In
Boyar, the San Antonio Court of Appeals held that homeowners who erected
screens over the top and sides of their backyard sufficiently enclosed the
backyard so that the screens could be considered an “enclosure” for city
ordinance purposes even though wind, rain, and sunlight could still enter their
yard.  158 S.W.3d at 548 & n.1, 551–52.  However, in a criminal case
construing the meaning of “enclosed area” for purposes of the burglary statute,
the court of criminal appeals held that a structure made of concrete blocks
with three doorways that were incapable of being closed was not an “enclosed
area.”  See Day v. State, 534 S.W.2d 681, 684–85 (Tex. Crim. App. 1976)
(“To hold that a structure of the design shown here is a building within the
definition in Sec. 30.01, . . . would expand the scope of structures which may
be the object of burglary to include open air stages with three walls and a
roof, or open carports with walls on both sides but none on the ends, or even
four-columned pavilions with no walls.  The structure here is no more an
enclosed structure than the examples just listed.”); see also Hudson v.
State, 737 S.W.2d 838, 839–40 (Tex. App.––Dallas 1987, pet. ref’d) (holding
that open walkway between two buildings was not enclosed area for purposes of
solicitation of a minor statute).

          Here,
like the building in Day, the RV shelter appears to be designed for the
purpose of protecting the RV from the elements rather than enclosing it so that
it is not readily visible from the street.  See Day, 534 S.W.2d at
684–85.  Thus, we conclude and hold that it is not an “enclosed area” for
purposes of article 1, section 17.  Accordingly, we conclude and hold that the
shelter is more in the nature of a detached carport, which according to article
1, section 3, may not face the street.  The Campbells did not present any
evidence contraverting the Leakes’ evidence that the RV shelter faces the
street.  We therefore further conclude and hold that the Leakes proved that the
RV shelter violates the restrictive covenants as a matter of law.  However, as
we discuss below, the Leakes were not entitled to the injunctive relief they
sought in their motion for summary judgment because the Campbells brought
forward evidence to defeat the Leakes’ no-evidence summary judgment on their
affirmative defenses.

As
evidence that the cabana and shed violate article 1, section 4, the Leakes
presented a letter from the ACC to the Campbells objecting to the cabana and
shed because they were moved onto the property.  However, the Campbells
presented affidavit evidence that the cabana and shed were both assembled and
installed on the property.  Accordingly, we conclude and hold that there is a
fact issue as to whether the cabana and shed violate article 1, section 4 of
the restrictive covenants.

Regarding
the shed’s violating article 1, section 9, the Leakes presented no evidence
that the roof of the shed is composed of asphalt composition shingles. 
Accordingly, we conclude and hold that they were not entitled to summary
judgment that the shed violates article 1, section 9.

          The
Leakes also claim that the Campbells failed to raise any evidence in support of
their affirmative defenses of waiver and violation of section 202.004(a) of the
property code.  However, the Campbells responded with affidavit evidence from
Therman that at least four other homes in the subdivision, which consists of
only fifteen homes and two streets, have garages or carports facing the street. 
Article 1, section 3 does not state that a garage or carport may not face the
street unless the ACC first gives its approval; thus, this is at least some
evidence that the ACC has abandoned enforcement of that particular provision.  See
Tanglewood Homes Ass’n v. Henke, 728 S.W.2d 39, 43–44 (Tex. App.––Houston
[1st Dist.] 1978, writ ref’d n.r.e.).

Additionally,
the Campbells presented affidavit evidence from Therman that when he first
approached Scott Leake about the RV shelter, Scott stated, “It won’t matter, I
won’t like it anyway . . . . do what ever you want.”  Although there is no
evidence that Scott is a member of the ACC, the ACC did authorize him and his
wife to sue to enforce the restrictive covenants.  Therman also averred in his
affidavit that he was never notified of any hearing on the request for a
variance; that no one ever came to inspect the shed, cabana, and RV shelter;
and that no one ever called him to discuss the dimensions or cost of the
cabana, shed, and shelter.  Taken together, this evidence––along with the
evidence above about the other homes with garages and carports facing the
street and the fact that the Leakes have not conclusively proven that the shed
or cabana violate the restrictive covenants––is at least some evidence that the
ACC’s decision was “arbitrary, capricious, or discriminatory.”  See Tex.
Prop. Code Ann. § 202.004(a); Whittier Heights Maint. Ass’n v. Colleyville
Home Owners’ Rights Ass’n, No. 02-10-00351-CV, 2011 WL 2185699, at *4 (Tex.
App.––Fort Worth June 2, 2011, no pet.) (mem. op.).  We therefore conclude and
hold that the trial court did not err by denying the Leakes’ motion for summary
judgment.

Attorney’s
Fees

          In
their second issue, the Leakes claim that the trial court erred when it awarded
attorney’s fees to the Campbells in the amount of $10,348 plus $305.32 in
costs.  Having determined that the trial court erred by granting summary
judgment for the Campbells, we reverse the award of attorney’s fees and costs. 
Although the Leakes also challenge the trial court’s refusal to grant them
their attorney’s fees, we overrule that complaint because we have held that the
trial court did not err by denying their motion for summary judgment.  We thus
sustain their second issue in part and overrule it in part.

Conclusion

          Having
sustained the Leakes’ first and second issues in part, we reverse the trial
court’s summary judgment and award of attorney’s fees to the Campbells and
remand this case for further proceedings in accordance with this opinion.

 

 

 

TERRIE LIVINGSTON

CHIEF JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; DAUPHINOT
and GABRIEL, JJ.

 

GABRIEL,
J. concurs without opinion.

 

DELIVERED:  August 31, 2011








 









[1]The Leakes claim that
the shed was preassembled off-site and placed on the Campbells’ property.

 





[2]Courts in other states
have come to the same conclusion.  See Bramlett v. Dauphin Island Prop.
Owners Ass’n, 565 So.2d 216, 218 (Ala. 1990); Carriage Hills Golf and
Country Club, Inc. v. Hertz, 305 So.2d 287, 288–89 (Fla. Dist. Ct. App.
1974); Emonet v. Tomlinson, 163 So.2d 382, 384–85 (La. Ct. App.), writ
ref’d, 246 La. 591 (1964); Keller v. Branton, 667 P.2d 650, 652–53
(Wyo. 1983).  But see Garden Quarter I Ass’n v. Thoren, 394 N.E.2d 878,
880–81 (Ill. 1979); Aurora Shores Homeowners Ass’n v. Hardy, 37 Ohio
App. 3d 169, 69–70 (Ohio Ct. App. 1987).  The Illinois and Ohio cases do not
say whether the restrictive covenants in those cases contained saving “no
waiver” language as did the restrictive covenants here.





[3]We also note that Buckner
did not involve a scenario in which construction was begun or completed in a
clandestine manner or in which construction was capable of completion within a
day or a few hours.  See Riordan v. Hale, 212 S.E.2d 65, 67–68 (Va.
1975).





[4]The Leakes did not move
for summary judgment on the ground that the structures were in violation of
paragraph 2 of the Right to Enforce section of the restrictive covenants.